IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

Lyn Wilmes and Bruce Wilmes,
individually, and as parents and next
friends of Child H, a minor,

     Plaintiffs,

v.

Halliburton Company, Halliburton Energy
Services, Inc., and SAIC Energy,
Environmental & Infrastructure, LLC,

     Defendants

Case No. 11-cv-01323-M

Hon. Vicki Miles-LaGrange

## FIRST AMENDED COMPLAINT

NOW COME the Plaintiffs, Lyn Wilmes and Bruce Wilmes, individually, and as

parents and next friends of Child H, a minor, (collectively "Plaintiffs"), who by and

through their attorneys, WEITZ & LUXENBERG, P.C. and HOMSEY, COOPER, HILL

& CARSON and in support of this Complaint against defendants Halliburton Energy

Services, Inc., Halliburton Company (collectively, "Halliburton") and SAIC Energy,

Environmental & Infrastructure, LLC , known at time relevant to this Complaint as The

Benham Companies, LLC, ("Benham"), allege and state as follows:

## I. NATURE OF THE ACTION

1.    This action is brought to protect and seek redress for Plaintiffs, whose property

was contaminated by pollutants including, but not limited to, ammonium perchlorate and

nitrates that have been released into the groundwater for decades by Halliburton, and

who, as detailed below, have suffered personal injuries due to the unknowing ingestion of these contaminants.

2.      Halliburton was engaged in dumping and releasing of these contaminants for more than 25 years, and was aware of the groundwater contamination for more than 20 years before it alerted any members of the community.  Indeed, Halliburton knew at least since the early 1990s that groundwater at the Duncan facility was heavily contaminated with nitrates, and knew or at least suspected since 1988 that the groundwater was also contaminated with perchlorate, but did not inform local residents, including Plaintiffs, until July of 2011.

3.      Halliburton retained Benham to conduct groundwater monitoring at the facility. Benham was responsible for monitoring the groundwater for contamination since at least 2003, but Benham negligently performed this monitoring, by not only failing to take or test samples for four years, but also, *inter alia*, never testing for perchlorate and never taking any steps to inform any residents of contamination in the groundwater that the Plaintiffs were drinking.  Moreover, for nearly four years from 2005 to 2009, Benham inexplicably failed to even test the few groundwater monitoring wells that were in place, which wells had previously shown extremely high levels of nitrates in the groundwater. Indeed, were it not for Benham's negligence, Plaintiffs would have known of the nitrate and perchlorate contamination years earlier than July of 2011, when they finally were told of perchlorate in the groundwater.

4.      Plaintiffs have suffered and will continue to suffer significant damages and injuries, as described in more detail below, as a result of Halliburton's and Benham's wrongful conduct.

## II. JURISDICTION AND VENUE

5.      All Plaintiffs are individuals who formerly resided at times material to this complaint in the city of Duncan, in Stephens County, Oklahoma, and who are currently residents of Oklahoma.

6.      Defendant SAIC Energy, Environmental & Infrastructure, LLC ("SAIC EEI"), formerly and at relevant times alleged in this complaint known as, *inter alia*, The Benham Companies, LLC, is a Delaware limited liability company with a principal place of business at 3700 West Robinson, Suite 200, Norman, Oklahoma and/or at 9400 Broadway Extension, Suite 300, Oklahoma City, Oklahoma.  Upon information and belief, Defendant SAIC EEI's sole member is R.W. Beck Group, Inc., a Washington corporation with a principal place of business in Virginia.  Defendant SAIC EEI may be served with process at its principal place of business or its registered agent, The Corporation Company, 1833 South Morgan Road, Oklahoma City, Oklahoma.

7.      Defendant Halliburton Company is a Delaware corporation with its headquarters and principal place of business located at 3000 North Sam Houston Parkway East, Houston, Texas.  Defendant Halliburton Company's registered agent is The Corporation Company, and may be served with process at 1833 South Morgan Road, Oklahoma City, Oklahoma.

8. Defendant Halliburton Energy Services, Inc. is a Delaware corporation with its headquarters and principal place of business located at 10200 Bellaire Boulevard, in Houston, Texas. Defendant Halliburton Energy Services, Inc.'s registered agent is The Corporation Company and may be served with process at 1833 South Morgan Road, Oklahoma City, Oklahoma.

9. At all times material to this matter, Halliburton owned and operated the Halliburton Services Osage Road Facility, in Duncan, Oklahoma at 605 West Osage Road (the "Osage Road facility") and engaged in, and continues to engage in, the transaction of business within Stephens County, Oklahoma.

10. Each of the Plaintiffs pray for judgment in an amount in excess of $75,000.00.

11. This Court has jurisdiction over this action under 28 U.S.C. § 1332 as there is complete diversity between the parties and the amount in controversy exceeds $75,000.00.

12. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated within Stephens County, in the Western District of Oklahoma.

### III. GENERAL ALLEGATIONS

History of Operations at the Osage Road Facility

13. From 1965 to 1992, Halliburton's primary operations at the Osage Road facility involved breaking down rockets and rocket motors for reuse.

14.     Beginning at least as early as 1965, Halliburton accepted spent military rocket motors at the Osage Road facility.  Once at the facility, Halliburton removed the propellant from the rockets and cleaned and prepared them for reuse.  The rocket propellant was composed largely of ammonium perchlorate, which, when it is allowed to enter soils and groundwater, results in contamination of both N-Nitrate[s] ("nitrates") and perchlorate.

15.     Halliburton's process of cleaning the rocket motors consisted of first cleaning out the solid propellant and liner from the motors by a hydrojetting process.  Halliburton discharged water into the motor case at high pressure to cut or force out the propellant and liner.

16.     The propellant and liner were then moved to a shaker table, which was intended to separate the process water, which at that point was contaminated with ammonium perchlorate, from the propellant and liner solids.  Halliburton placed the solids in aluminum containers, and most of the water was returned to the jetting stream for reuse.  Some of the water was not recaptured, however, and that water was collected in a settling tank to the extent it did not overflow the work area onto the surrounding soils.

17.     Either at the end of the day or once the process water became too "dirty" for reuse, Halliburton released the now contaminated water to the settling tank, where it was allowed to settle for up to three days.  Halliburton intended this retention time to allow any remaining solid propellant or liner in the water to separate from the water; any leftover solids were collected and placed, along with the solids removed directly from the rocket, into a container for burning in burn pits, as described below.  The water, which at

this point was highly contaminated with ammonium perchlorate from the propellant, was pumped through a pipe or channel into an evaporation pond.

18.     At the time this rocket recovery operation ceased in the early 1990s, the evaporation pond was approximately 120 feet long by 85 feet wide and eight feet deep, and held approximately 350,000 gallons of liquid.  The Oklahoma Department of Water Resources issued Halliburton a waste water discharge permit for the evaporation pond in 1971, labeling it a "No Discharge Lagoon."  Upon information and belief, the evaporation pond was unlined until approximately 1989, when Halliburton installed a synthetic liner.  Thus, until Halliburton finally lined the evaporation pond, contaminated water in the unlined pond would seep into the soil and groundwater.

19.     Even after the liner was installed, the pond was not fully protected against leaks. For example, when there were heavy rains, the evaporation pond would often overflow onto the surrounding unprotected ground, where it would seep into the soil and groundwater.  Upon information and belief, the liner and/or the pipe transporting the contaminated water to the pond were at times faulty or cracked, and allowed contaminated water to seep into the soil and groundwater.

20.     Halliburton's own analysis of the water in the evaporation pond in 1988 and 1992 showed perchlorate levels at over 35,000 milligrams per liter and 29,000 milligrams per liter, respectively.  These levels are approximately two million times higher than the current federal health advisory level for perchlorate in drinking water of 15 *micro*grams per liter.

21.    After removing the solid propellant from the rocket motor and shaking off some of the liquids, Halliburton took the propellant to earthen burn pits.  The burn pits were approximately 40 feet long by 15 feet wide and eight to 12 feet deep.  The pits were completely unlined at all times during more than two decades of these rocket recovery operations.

22.    Halliburton generally allowed the solids to dry for one or two days in the burn pits. During this drying time, contaminants, including ammonium perchlorate, continued to seep into the soil of the unlined burn pits and into the groundwater.  Once the propellant dried for some period of time, Halliburton set it on fire; the burn lasted approximately eight minutes, but the remnants would "glow as ash" for several hours.  Generally, Halliburton used two active pits so workers could alternate the pits each day, as the embers would often still be glowing the following day, preventing the use of that pit.

23.    Upon information and belief, perchlorate and nitrates entered the soil and groundwater from the burn pits.  As stated above, Halliburton did not line the pits with anything, and contaminants from the propellant seeped directly into the soil and groundwater in and around the burn pits.  In addition, when it rained, the material was left in the pit to be rained on, and not burned until dry.  As a result, rainwater washed perchlorate and nitrates into the soil and groundwater.  A report from the Oklahoma Department of Environmental Quality ("DEQ") noted that occasionally there would be standing water in the burn pits.  On at least one occasion, the water was approximately two feet deep.  The standing water would occasionally be pumped out of the burn pit to

the evaporation pond. Much of this water would simply seep into the soils and groundwater under the burn pits.

24. At least every two years, the burn pits became filled with liner material, soil, and ash; Halliburton then covered the pits with dirt and new pits were dug. A Halliburton report noted that a pit would contain approximately 171 cubic yards of residue and contaminated soil. Upon information and belief, Halliburton took no steps to cover the pit with any type of cap or liner to prevent further contamination of the groundwater from rainwater seeping through the soil into the aquifer and carrying with it contamination from the pits.

25. Upon information and belief, Halliburton disposed of approximately 30,000 to 80,000 pounds of ammonium perchlorate each year of operation; Halliburton records indicate that in the years 1980 through 1985, an average of nearly 50,000 pounds of propellant was burned each year, with the highest amount being 99,170 pounds burned in 1985.

26. Halliburton knew at least as early at 1987 that the unlined burn pits were an environmental problem. A 1987 Halliburton internal report stated that to be considered a treatment unit, Halliburton would "probably need to construct a concrete-lined unit, burn the propellant there, then haul off the ash or store it." This recommendation was never followed, and Halliburton continued to use unlined burn pits until the operation was closed in the early 1990s.

27. Upon information and belief, Halliburton represented to state and federal agencies that no hazardous wastes were generated in the rocket motor recovery operations. In fact,

by letter dated May 25, 1982, Stephen Burford, Halliburton's Senior Environmental Engineer, specifically informed the Oklahoma State Department of Health that "we have not generated hazardous waste, nor have we stored or disposed of any hazardous waste material in this area."

28.     Halliburton's knowledge of the potential for perchlorate issues dates at least to the 1980s.  Stephen Burford wrote a letter to the Oklahoma Department of Health on August 9, 1988, stating that perchlorate was found in the drinking water at the Halliburton facility, which came from a well on the site.  Halliburton eventually discontinued using well water at the site for drinking, electing to bring in bottled water, but took no steps to inform any of the local residents, including Plaintiffs, that they should take the same steps to protect their own health.  The 1988 letter also notes that there was a "considerable amount" of perchlorate in the evaporation pond water, which the analysis showed to be over 35,000 milligrams per liter, or parts per million ("ppm").

29.     As noted above, another analysis of the evaporation pond water in 1992 showed perchlorate concentration to be over 29,000 ppm.

30.     Halliburton was also advised of the potential for perchlorate contamination in the groundwater in 1990, as a site inspection performed March 27, 1990 noted a high potential for release to soil and groundwater from both the evaporation pond and the burn pits.

31.     In December of 1991, after Halliburton had applied for a permit to comply with applicable regulations for the rocket motor recovery operations, the Oklahoma State Department of Health issued Halliburton a Notice of Deficiency.  The notice stated that

in their application, Halliburton was required to, but had failed to, address a large number of issues. Relevant to this Complaint, the notice stated that Halliburton must:

      a.  Provide information regarding the protection of groundwater and surface water at the facility, including the potential for migration of waste through the soil beneath the burn pits into the groundwater;

      b.  Provide information regarding the effectiveness and reliability of the burn pits to contain collect and confine wastes; and

      c.  Develop a groundwater monitoring plan to determine if hazardous constituents from the operation at the facility are in the groundwater.

32.    On September 14, 1992, Halliburton ceased its spent rocket motor operations and submitted a closure plan regarding these activities to state authorities. Upon information and belief, this determination was due, in significant part, to Halliburton's desire to avoid the foregoing monitoring and investigatory requirements in the Notice of Deficiency.

33.    In August 1993, as part of Halliburton's closure plan, Halliburton evacuated waste from the most recently active burn pits and sent it to East Oak Landfill in Oklahoma City. Halliburton only performed this evacuation for pits that were active at that time. As described above, there were many inactive pits that had previously been covered with soil. Halliburton kept no record of the locations of these former burn pits, so they could not be evacuated.

34.    Also as part of the closure plan, Halliburton installed groundwater monitoring wells in the area believed to be the area of "the inactive burn pit site," to determine whether any hazardous wastes were migrating from that area.

35.    Halliburton also removed the pipe used for pumping water to the evaporation pond and the liner for disposal offsite.  Halliburton removed the contaminated water by evaporation or vacuum truck.  Halliburton records indicate that, after being put through a reverse osmosis process to attempt to remove contamination, this water was disposed of through the City of Duncan sewer system.  Upon information and belief, the closest City of Duncan sewage disposal pond is located to the northwest of the Halliburton facility, just north of Gatlin Road and east of Highway 81, and either Halliburton or the City of Duncan disposed of contaminated wastewater there.

36.    Upon information and belief, at least as early as October of 2002, Halliburton retained Benham to conduct and oversee the monitoring and testing of the groundwater at the Osage Road facility.  Upon being retained, Benham reviewed various Halliburton and DEQ documents, including groundwater testing results, closure plans, and other documents dating from at least as early as 1982.  Benham thus knew the history of operations at the Halliburton facility and knew or should have known what contaminants were potentially in the groundwater, including perchlorate and nitrates.

37.    Benham began testing the groundwater from Halliburton's on-site monitoring wells on or before November 19, 2003, and was to continue performing biannual testing thereafter.

38.    Of all the soil sampling and groundwater testing that Halliburton and Benham performed, none of the tests checked for perchlorate until at least 2009.  In addition, neither Halliburton nor Benham placed any monitoring wells around or even down gradient from the evaporation pond until 2010.  The monitoring wells around the former

burn pit area were up gradient from the evaporation pond and could not reveal any information regarding the groundwater under and migrating from the area around the evaporation pond. Further, the monitoring wells that were installed as part of the closure were all less than 30 feet deep.

39.    Halliburton and, at least since 2003, Benham did test the monitoring wells for nitrates, and at certain times detected extremely high levels. In December of 1995, groundwater testing revealed nitrates at levels between 10 and 460 ppm. In December of 1999, testing found that four of the five monitoring wells showed nitrates at levels above 260 ppm, with one well as high as 5,600 ppm. Although it is not known whether Benham had been retained at the time this testing was performed, Benham did review all of this information at least as early as 2002 and knew of these results. As these ranges suggest, the test results varied wildly; even tests at the same well would swing by orders of magnitude on different dates.

40.    At the time, as Halliburton and Benham both knew, the maximum allowable nitrate level in drinking water was 10 ppm. Thus, Halliburton's own samples of groundwater at the site showed levels of nitrates up to 560 times higher than the maximum allowable levels. Notably, these tests showed nothing of the levels of contamination downgradient from the evaporation pond.

41.    Upon information and belief, Benham had knowledge of the previous uses of the site and of the high nitrates levels when it was retained by Halliburton. Based on this knowledge and from knowledge gleaned from reviewing Halliburton's and DEQ's records, Benham knew or should have known to test for perchlorate and knew or should

have known of the dangers of high nitrates levels when it first began testing the groundwater on the Halliburton site in or before 2003.

42.    However, neither Halliburton nor Benham notified any local residents, including Plaintiffs, of the nitrates results.  Upon information and belief, the results still have not been reported by Halliburton or Benham to any local residents, including Plaintiffs, despite the fact that Halliburton and Benham both knew that the residents surrounding the site relied on private wells for their drinking water.

43.    Moreover, despite knowing of at least the high levels of nitrates contamination in the groundwater, and despite an obligation to conduct continuous testing, Halliburton and Benham failed to test the water from the monitoring wells even a single time for nearly four years, from July of 2005 to June of 2009.

44.    Upon information and belief, at least as early as August 2008, apparently as a result of the high levels of nitrates previously detected in the monitoring wells, Halliburton and Benham both suspected that there was likely also a problem with perchlorate in the groundwater.

45.    An email from an Environmental Programs Manager of the DEQ sent August 13, 2008 suggests that Halliburton believed that the high nitrates levels detected at the Halliburton site may have actually been perchlorate from Halliburton's former rocket fuel operations.

46.    Accordingly, it was the groundwater testing for nitrates that triggered the long overdue realization by Benham and Halliburton that testing for perchlorate was necessary.  Significantly, this realization came at approximately the same time that

Benham "discovered" it had negligently failed to monitor or even sample the existing wells. Upon information and belief, had Benham not been negligent in the groundwater testing it had undertaken, and had performed the groundwater testing from 2005 through 2009, it or Halliburton would have and should have realized long before 2008 that the nitrates levels were indicative of perchlorate in the groundwater. Thus, were it not for Benham's negligent monitoring, Plaintiffs would have learned of their perchlorate exposure at least three to four years earlier than when they were actually informed in July of 2011.

47.    Furthermore, in 2008, a Halliburton employee was documented to have discussed with the DEQ concern that perchlorates had not been tested for at the site and suggested that Halliburton reassess to test for perchlorates.

48.    Despite all of the forgoing, it was not until June of 2009 that Halliburton and Benham performed any tests for perchlorate in the groundwater. Those tests revealed perchlorate in the existing monitoring wells, at levels up to 6,100 ppb, more than 300 times the current health advisory level of 15 ppb.

49.    Apparently based on this testing, Halliburton and Benham decided to test for perchlorate beyond the area of the burn pits. In May of 2010, Halliburton and Benham installed six new monitoring wells to test for perchlorate. As described in detail below, these wells were installed downgradient from the existing wells in the former burn pit area, and also, for the first time, downgradient from the evaporation pond.

50.    In April or May of 2011, Halliburton and Benham found high levels of perchlorate in the groundwater at the Halliburton facility, which it believed to be migrating offsite to

private property.  As a result, Halliburton and/or Benham contacted the DEQ, then conducted well water sampling of private water wells near the Halliburton facility on June 1 through June 6, 2011.

51.     The results of these tests showed high levels of perchlorate in the private wells of residents and in their drinking water.  Of approximately 176 total properties tested, 90 detected perchlorate, and 27 had perchlorate levels above the EPA advisory level of 15 ppb, with the highest over 50,000 ppb.

52.     For all of the reasons stated above, long before this testing confirmed the fact, Halliburton knew or should have known that its practices would result and had resulted in contaminants, including perchlorate and nitrates, polluting the groundwater, and that the contaminants would migrate to Plaintiffs' properties and wells.  Benham also knew or should have known that nitrates and perchlorate were polluting the groundwater and migrating to Plaintiffs' properties and wells at least as early as 2002.  Neither Halliburton nor Benham notified local residents of this hazard until July of 2011.  In fact, upon information and belief, neither Halliburton nor Benham has ever alerted local residents, including Plaintiffs, to the potential for high levels of nitrates in their water.

53.     In August 2011, Halliburton entered a Memorandum of Agreement and Consent Order ("Order") with the DEQ regarding the contamination.  In the Order, Halliburton informed the DEQ that the Halliburton activities that are the source of, or that may have contributed to, contamination at and surrounding the facility include:

> a.  The storage of rinse water containing perchlorate from missile cleaning
>
>     operations in an evaporation pond that resulted in the release and/or

potential release of perchlorate to the soil and groundwater at the

Halliburton site, and;

b. The torch cutting and storage of rod racks from a nuclear power plant in the

Rod Rack Restricted Area ("RRRA") of the site that resulted in radiological

contamination.

54.    The Order also states that the following conditions exist or have existed in the past

at the Halliburton site that are not or were not in compliance with any environmental laws

or regulations:

a. The discharging, releasing or leaching of perchlorate from the former

evaporation pond into the soils and groundwater at the site;

b. The releasing, leaching or migrating of perchlorate from groundwater at the

site into groundwater, aquifers, or water wells offsite; and

c. The on-site radiological contamination from the RRRA and the burn pits at

the site.

The Groundwater and Plume of Contamination

55.    Halliburton's operations described above have resulted in a plume of

contamination polluting groundwater at and surrounding the Osage Road Facility (the

"Plume").  Because of Benham and Halliburton's wrongful conduct, this Plume has been

allowed to spread uncontrolled and unmonitored for decades.

56.    At least at shallow levels, Halliburton and Benham have reported that the

groundwater of the area around the former burn pits at the Halliburton facility flows in

different directions.  They reported these flow patterns in a May 2010 sampling plan.

Specifically, in trying to detect the flow of perchlorate contamination at the facility, they sought to place additional sampling wells "downgradient" from existing wells "[b]ased on groundwater flow direction."  In the burn pit area, Benham placed new monitoring wells 8 and 9 to the northwest of existing monitoring well 4 (which was on the northwest corner of the burn pit area), indicating a northwesterly flow of groundwater in that area. New monitoring wells 12 and 13 were placed north of existing well 7, which was on the north side of the burn pit area, indicating a northerly flow of groundwater in that area. New monitoring wells 10 and 11 were placed south of existing monitoring well 1 (which was on the southeastern part of the burn pits), and east and southeast of existing wells 2 and 3 (which were on the southern portion of the burn pit area), indicating a flow of groundwater to the east and southeast of that portion of the facility.  Finally, new monitoring wells 14, 15 and 16 were placed to the south and southeast of the evaporation pond, confirming a basically southeasterly flow from that area of the facility.

57.    More recent sampling has further revealed high levels of perchlorate contamination to the west of the Osage road facility, indicating that groundwater from the facility also flows to the west, likely due to seasonal pumping in the area.

58.    The heaviest contamination has appeared to the southeast of the evaporation pond, which is consistent with the general flow of groundwater in the area.  But perchlorate has also been found north and northwest of the facility, consistent with Halliburton's and Benham's beliefs of flows in those directions from the former burn pit areas.

59.    Upon information and belief, and based on testing done to date, the Plume of groundwater contamination currently extends from the Halliburton Osage Road facility in

the south and southeast directions to Camelback Road, to the west of the site beyond

Highway 7, and to the north and northwest of the Osage Road facility in the area

extending to and slightly above Gatlin Road.

60.    It is entirely possible, and evidence developed in discovery may reveal, that the

Plume currently extends or formerly extended further than the area described above, but

for the purposes of this Complaint, the Plume is defined as set forth above, based on

existing data and Halliburton's own reports.  Indeed, due to the high solubility, stability,

and mobility in water of both perchlorate and nitrates, the plume could potentially extend

much further than this.  As an example, a perchlorate plume at a site in California extends

more than nine miles.

61.    Based on the long duration and method of operations detailed above, and on the

testing of groundwater that has occurred at and surrounding the Halliburton Osage Road

facility, it is clear that residents in the vicinity of the Halliburton facility were exposed to

high levels of these contaminants for many years, and continue to be exposed today.

Contaminants at Issue

62.    Ammonium perchlorate is a manufactured form of perchlorate salt primarily used

as an oxidizer in fuel for rockets and other explosives; 90 percent of perchlorate in the

United States is estimated to be ammonium perchlorate from the defense and aerospace

industries.

63.    Ammonium perchlorate is extremely soluble in water, and mobile in the

environment—migrating quickly from soil to groundwater.  It is also very stable and can

persist in groundwater for decades.  As noted above, ammonium perchlorate can show up in groundwater as nitrates and perchlorate.

64.    When ingested, perchlorate blocks the transport of iodide from the blood into the thyroid gland; iodide uptake is essential for the synthesis of thyroid hormones (thyroxine ($T_4$) and triiodothyronine ($T_3$)).

65.    Thyroid hormones are essential to the regulation of oxygen consumption and metabolism in adults, as well as for growth and neuro- and physical development in fetuses, infants and young children; they affect the functions of nearly every organ system.

66.    Deficient iodide uptake and the resultant deficient hormone production results in hypothyroidism, a condition associated with the following symptoms and/or ailments: female infertility, irregular or heavy menstrual cycles, poor muscle tone, fatigue, hyperprolactinemia, elevated serum cholesterol, increased sensitivity to cold, constipation, rapid thoughts, muscle cramps and joint pain, weakness, thin or brittle fingernails, coarse hair, paleness, decreased sweating, dry or itchy skin, slow speech and a hoarse voice, weight gain, low heart rate, goiter, loss of equilibrium, decreased concentration, an enlarged thyroid gland, and depression.  Hypothyroidism has also been linked to rare complications such as severe depression, impaired memory, hair loss, anemia, deafness, heart failure, and coma.  Some medical studies also suggest that hypothyroidism can cause ovarian cysts.

67.    Short-term exposure to high doses of perchlorate can also cause eye and skin irritation, coughing, nausea, vomiting, and diarrhea.

68.    Maintaining adequate levels of thyroid hormones during pregnancy is critical for proper fetal brain development.  A 2010 study by the EPA Office of the Inspector General showed that a pregnant mother with inadequate hormone levels can cause a child to have the following developmental ailments: attention-deficit/hyperactivity disorder, lower verbal intelligence quotient, lower overall IQ, lower motor performance, and mild thyroid dysfunction later in childhood.

69.    Studies showing the harmful effects of perchlorates were first published in the 1950s.  They included that perchlorates impair normal thyroid function and affect a fetus more seriously than an adult.

70.    Although as yet unregulated by the EPA, perchlorate has been on the EPA's Contaminant Candidate List beginning in 1998.  EPA has decided to regulate perchlorate under the Safe Drinking Water Act ("SDWA"), but has not yet issued a finalized regulation.

71.    EPA has issued an interim health advisory level for perchlorate at 15 parts per billion (ppb), or micrograms (μg) per liter.

72.    Other states that have already set Maximum Contaminant Levels ("MCLs") for perchlorate include Massachusetts and California.  California set a MCL for perchlorate at 6 ppb, and in January of 2011, released a draft technical support document for a public health goal of 1 ppb.  Massachusetts set a MCL for perchlorate at 2 ppb, with a reporting level of 0.0010 mg/L.

73.    Halliburton and Benham knew or should have known that perchlorate was dangerous at least since the early 1980s, as it was categorized as a hazardous waste under

RCRA; Halliburton also noted that it had researched the effects that ingestion of perchlorate can have on human health in a letter from Stephen Burford to the Oklahoma Department of Health dated August 9, 1988. Halliburton and Benham also should have known of the dangers of perchlorate to human health based on the studies performed and published in the 1950s.

74.    Plaintiffs, however, had no way of knowing that Halliburton was dumping so much perchlorate and were unable to detect perchlorate in their private wells without specifically testing for it.

75.    Nitrates, which can also result from ammonium perchlorate contamination, are also highly mobile, allowing them to easily leach into groundwater.

76.    Ingestion of high levels of nitrate can cause methemoglobinemia, a condition where the blood cannot carry enough oxygen. This condition is especially dangerous to infants, and can result in "blue baby syndrome," which if left untreated can cause death. Methemoglobinemia can also result in long-term digestive and respiratory problems to infants or children affected.

77.    Prolonged consumption of high levels of nitrate is also linked to gastric problems in humans, and common symptoms of high nitrate intake include abdominal pain, diarrhea, muscular weakness, and poor coordination.

78.    A Scientific Assessment of Perchlorate from the Office of the Inspector General for the EPA in 2010 states that nitrate can also block iodide uptake by the thyroid.

79.    The EPA set a MCL for nitrates in the form of $NO_3$ - N, the same form as that discovered in high levels at the Halliburton facility, at 10 milligrams per liter. This

standard became effective in 1992, meaning that Halliburton knew or should have known that nitrates on site were far in excess of the Safe Drinking Water Standards in 1995, and even so, neglected to even test for them from 2005 through 2009.

Nuclear Fuel Rack Operation

80.    In addition to the rocket motor recovery operations detailed above, Halliburton has also engaged in operations that potentially threaten nearby residents, including Plaintiffs, with radioactive contamination.  Because, upon information and belief, Halliburton has never tested for radiation off-site, it is simply not known at this time whether and at what levels of radiation Halliburton's neighbors have been exposed to, or how far that radiation has spread.  Nevertheless, the history of these operations is included here as background of the nature and quality of the operations performed by Halliburton at the facility.

81.    In approximately November 1983, Halliburton began receiving spent fuel racks from the Fort Calhoun, Nebraska nuclear reactor under a license issued by the Nuclear Regulatory Commission ("NRC"); Halliburton received a total of 21 racks between November 1983 and April 1984.

82.    Halliburton originally intended to decontaminate the racks and sell the cleaned metal as scrap, but feasibility tests showed that decontamination was not possible; Halliburton then "torch cut" the racks into smaller pieces, repackaged the pieces and sent the material to a disposal facility out of state.

83.    From approximately July 1985 through September 1985, Halliburton cut the racks into pieces, with all of the cutting performed inside of a tent erected solely for this purpose and equipped with ventilation.

84.    In January 1987, the NRC performed an unannounced inspection of the Halliburton facility in response to an anonymous call to the Oklahoma Department of Health alleging that unlawful activities involving radioactive material were being performed on the site.  The NRC found multiple violations, including, but not limited to, the following:

      a.  the tent used to contain the cutting operations was not as authorized by the license which required a wooden substructure;

      b.  adjacent "burn pits" were used to burn contaminated personal protective equipment;

      c.  the tent may have been ineffective due to hot slag burning holes into the tent; and

      d.  employees routinely ran non-HEPA filtered air conditioning units—a practice procedurally forbidden.

85.    As a result of the cutting operations, radioactivity persists today at elevated levels in certain areas of the Halliburton Osage Road facility.  The NRC found numerous spots of radioactive contamination at the facility, with radiation readings ranging from several times background levels to several millirems per hour.  The radiation is believed to come from the radionuclide Cesium-137, and also possibly from Cobalt-60.

86.    A site assessment performed for Halliburton in October 2002 determined that contamination at the facility is in excess of the 25 mrem per year unrestricted release dose limit set by the NRC.

## IV. SPECIFIC ALLEGATIONS RELATING TO PLAINTIFFS

87.    As the term is used below, a "PI Plaintiff" is defined as an individual who suffered personal injury due to defendants' wrongful actions.

**Lyn and Bruce Wilmes and Child H**

88.    Plaintiffs Lyn and Bruce Wilmes, wife and husband, resided at the property located at 311 West Osage Road, Duncan, Oklahoma, from September 2000 to March 2012.  Lyn and Bruce Wilmes also bring claims on behalf of their minor child, Child H, age 15, born in 1997.  Child H, Lyn and Bruce Wilmes are "PI Plaintiffs" as that defined term is used in this complaint.  Lyn, Bruce, and Child H are collectively referred to as "the Wilmes."

89.    During the time that they resided at the property, the Wilmes obtained the water they used at their home from a private well on the property.  The private well sits above and draws water from groundwater contaminated by the Plume of contamination, defined above, which has resulted from defendants' actions.  Accordingly, the Wilmes have in the past been exposed to, and, as alleged below, injured by, the groundwater contaminated by defendants.

90.    Prior to learning of the contamination of their groundwater, the Wilmes relied on contaminated well water for the purposes of drinking, bathing, washing dishes, watering the lawn, and filling a pool for recreational swimming.

91.    Plaintiff Child H was diagnosed with hypothyroidism in 2011.  Child H has also suffered from joint pain and gastrointestinal issues.  Upon information and belief, these

illnesses and disabilities have resulted from Child H's exposure to contaminated well water.

92.    The Wilmes have also experienced emotional distress as a result of learning that they had been unknowingly drinking, consuming, and had otherwise been exposed to contaminated groundwater for years, and that their child had been exposed to contaminated groundwater.  The Wilmes have suffered from stress and many sleepless nights.  The Wilmes have also suffered from anxiety and distress due to being compelled to move out of the area of the Plume of contamination.

## VI. CAUSES OF ACTION

## FIRST CAUSE OF ACTION: NEGLIGENCE AND/OR GROSS NEGLIGENCE AGAINST HALLIBURTON AND BENHAM

93.    Plaintiffs reallege and restate the allegations in paragraphs 1–92 above as if fully set forth herein.

94.    Halliburton owes and continues to owe a duty to all Plaintiffs to exercise ordinary care and diligence so as to perform its operations safely, taking into consideration the effects of its operations on its neighbors and community.  The duties Halliburton owed and continues to owe to Plaintiffs include, but are not limited to, the following:

> a.    To dispose of its wastes, including  wastewater and ash contaminated with ammonium perchlorate and/or nitrates in a manner that protects Plaintiffs and the environment from unreasonable harm;

b. To prevent the migration of pollutants dangerous to human health and the environment from the Halliburton facility into the groundwater and onto Plaintiffs' properties;

c. To monitor the groundwater for possible migration of dangerous contaminants;

d. To inform Plaintiffs in a prudent and timely manner of, and take any action necessary to protect them from the hazards of exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations at its facility; and

e. To protect Plaintiffs from being harmed by exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations, including by providing them with an alternate source of water, and continuously monitoring and informing Plaintiffs of contaminant levels.

95.    Benham owed and continues to owe a duty to all Plaintiffs to exercise ordinary care and diligence so as to conduct its environmental work thoroughly and with competence. The duties Benham owed and continues to owe to Plaintiffs include, but are not limited to, the following:

a. To develop a groundwater monitoring and testing plan and procedure based upon its expertise and reasonable knowledge of the Halliburton site to analyze all potential dangerous pollutants;

b. To monitor and prevent the migration of pollutants dangerous to human health and the environment from the Halliburton facility into the groundwater and onto Plaintiffs' properties;

c. To monitor the groundwater for possible migration of dangerous contaminants;

d. To continue to monitor the groundwater for possible migration of dangerous contaminants continually and at regular intervals;

e. To inform Plaintiffs in a prudent and timely manner of, and take any action necessary to protect them from the hazards of exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations at its facility; and

f. To protect Plaintiffs from being harmed by exposure, through ingestion and/or otherwise, to groundwater contaminated due to Halliburton's operations, including by monitoring and informing Plaintiffs of contaminant levels.

96.    Halliburton knowingly breached these duties by failing to take reasonable care and allowing contaminants to escape into the groundwater and migrate offsite to Plaintiffs' properties.  Halliburton's breaches of ordinary care and diligence include, but are not limited to, the following:

a. Failing to dispose of contaminated wastewater in a safe manner that did not harm Plaintiffs;

b.  Failing to dispose of rocket propellant and ash in a safe manner that did not harm Plaintiffs;

c.  Failing and continuing to fail to prevent the migration of hazardous chemicals from the Halliburton facility onto Plaintiffs' properties;

d.  Failing to monitor for perchlorate in the groundwater prior to 2011;

e.  Failing to monitor for nitrates or any other contaminants in the groundwater from July of 2005 to June of 2009;

f.  Failing to alert Plaintiffs to the presence of high levels of nitrate and perchlorate in the groundwater; and

g.  Such other breaches as may become apparent during the course of discovery in this matter.

97.    Benham knowingly breached these duties by failing to take reasonable care and failing to properly test for and monitor contamination in the groundwater at and surrounding the Osage Road facility, allowing contaminants to migrate offsite to Plaintiffs' properties without any warning to Plaintiffs.  Benham's breaches of ordinary care and diligence include, but are not limited to, the following:

a.  Failing to monitor for perchlorate in the groundwater at any time prior to 2009;

b.  Failing to recognize the need for or recommend testing for perchlorate prior to 2008.

c.  Failing to monitor for nitrates or any other contaminants in the groundwater from July of 2005 to June of 2009;

    d.  Failing to alert Plaintiffs to the presence of high levels of nitrates and perchlorate in the groundwater since learning of those contaminants at least as early as 2003; and

    e.  Such other breaches as may become apparent during the course of discovery in this matter.

98.    Halliburton's conduct constitutes gross negligence as it knew or was substantially unconcerned that there was a substantial and unnecessary risk that its practices would result in serious injury to Plaintiffs. This is apparent from Halliburton's actions and/or inactions described above, including, but not limited to Halliburton's:

    a.  Using an unlined evaporation pond for years, and using unlined burn pits for the entire extent of the rocket motor recovery operations, despite knowing that such practices allowed contamination to escape directly into soils and the groundwater;

    b.  Knowing that rain caused contaminated water to escape the evaporation pond and burn pits onto soil and into the groundwater, but failing to take any measures to protect against that risk or prevent it from happening;

    c.  Covering burn pits for years without keeping any record of where they were located, taking any steps to clean the burn pits prior to covering them, or taking any steps to prevent further migration of contamination from the unlined burn pits after covering them with soil, for example by capping the pits;

d.   Failure to test for perchlorate in the groundwater prior to 2009, despite
knowing of perchlorate contamination at the facility for decades and
expressly acknowledging the likelihood of perchlorate contamination in the
groundwater since at least 2008;

e.   Failure to alert nearby residents, including Plaintiffs, of contaminated
groundwater even after knowledge that Halliburton's own on-site well
could no longer be used for drinking water because of contamination of the
groundwater at the facility;

f.   Failure to alert any local residents, including Plaintiffs, of extremely high
levels of nitrates in the groundwater;

99.   Halliburton's gross negligence and reckless disregard for the rights of others
entitles Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs
from any statutory cap on damages arising from bodily injury.

100.   As a direct and proximate result of Halliburton's negligence and/or gross
negligence, Plaintiffs have sustained the damages more fully described above.

101.   As a direct and proximate result of Benham's negligence, Plaintiffs have sustained
the damages more fully described above.  Specifically:

a.   Benham's failure to alert any Plaintiffs to the known existence of nitrates in
their groundwater caused any injuries to Plaintiffs resulting from exposure
to nitrates since at least 2003, the latest date by which Benham knew of the
nitrates contamination and failed to alert Plaintiffs, and caused or
contributed to any injuries suffered by Plaintiffs resulting from exposure

prior to 2003 to the extent such exposure continued after 2003, as alleged above.

b.  Benham's negligence in failing to test for perchlorate until 2009 caused or contributed to all injuries suffered by plaintiffs due to any exposure to perchlorate they suffered after 2003, the latest date by which Benham should have commenced testing for perchlorate.

c.  Benham's negligence in failing to perform any testing from approximately 2005 through 2009 resulted in an even longer delay in the commencement of any testing for perchlorate because, as alleged above, it was the testing for nitrates that brought about the belated recognition by Benham and Halliburton that testing for perchlorate was necessary.  Were it not for Benham's negligence, Plaintiffs would have been (and should have been) advised to cease drinking from private wells by no later than 2005, when Benham negligently ceased monitoring the groundwater.  Consequenlty, Benham's negligence caused all injuries suffered by Plaintiffs exposure to perchlorate that were incurred after 2005 and caused or contributed to injuries suffered by Plaintiffs as a result of exposure to perchlorate prior to 2005, insofar as such Plaintiffs exposure to the contamination after 2005 would have otherwise been avoided were it not for Benham's negligence.

102.  Halliburton was also and/or in the alternative negligent under the doctrine of res ipsa loquitur because the perchlorate was under Halliburton's exclusive control and the

high levels of perchlorate would not have migrated to Plaintiffs' wells in the ordinary course of events if due care had been exercised.

## SECOND CAUSE OF ACTION: NEGLIGENCE PER SE AGAINST HALLIBURTON

103.    Plaintiffs reallege and restate the allegations in paragraphs 1–102 above as if fully set forth herein.

104.    Defendant violated Oklahoma Statute Title 27A, section 2-6-105, which declares it "unlawful for any person to cause pollution of any waters of the state or to place or cause to be placed any wastes in a location where they are likely to cause pollution of any air, land or waters of the state" because Halliburton caused contaminants, including perchlorate and nitrates, to pollute the groundwater of Oklahoma under and surrounding the Halliburton facility and Plaintiffs' properties.

105.    Defendant also violated Article 2, section 23 of the Oklahoma Constitution by damaging Plaintiffs' properties due to Halliburton's own private acts, without the consent of the Plaintiffs.

106.    The above statute and Constitutional provision were and are intended to prevent injuries such as those suffered by Plaintiffs because Plaintiffs rely on Oklahoma groundwater for their drinking and other daily uses, and because Plaintiffs' properties were damaged by Halliburton's activities.

107.    Plaintiffs are within the class of persons intended to be protected by this statute and Constitutional provision because they are private citizens of the State of Oklahoma

and they rely on clean public water and have protectable property interests within the State.

108.    Plaintiffs' injuries were directly and proximately caused by the Defendant's violation of this statute and Constitutional provision as described above.

109.    Halliburton's reckless disregard for the rights of others in violating this statute and Constitutional provision and in acts described more fully above entitles Plaintiffs to an award for punitive or exemplary damages and exempts Plaintiffs from any statutory cap on damages arising from bodily injury.

### THIRD CAUSE OF ACTION: STRICT LIABILITY AGAINST HALLIBURTON

110.    Plaintiffs reallege and restate the allegations in paragraphs 1–109 above as if fully set forth herein.

111.    Plaintiffs believe and allege above that the exercise of due care could have and should have prevented the contamination of groundwater at and surrounding the Osage Road facility.  In the event that discovery in this matter reveals that the risks posed by the contaminated wastewaters and ash could not have been eliminated, even by the exercise of reasonable care and prudence in handling them, Halliburton is still alternatively liable in this action because it was engaged in an abnormally dangerous activity, as alleged below.

112.    Halliburton's disposal of harmful contaminants, including ammonium perchlorate, at the Osage Road facility constitutes an abnormally dangerous condition and/or activity.

113.    Halliburton's actions posed a high risk of serious harm to residents in nearby communities because Halliburton was working with dangerous contaminants that could

easily pollute the groundwater on which surrounding properties relied for their drinking water.

114.    As Halliburton knew, both perchlorate and nitrates are highly soluble, stable, and mobile in groundwater and would likely migrate offsite.

115.    Halliburton's actions in cleaning used rocket engines and disposing of the contaminated wastes in an evaporation pond and unlined burn pits are not matters of common usage in the community, and are especially not appropriate where private residents who rely on private wells for their drinking water live near the facility.

116.    As a result of Halliburton's actions, Plaintiffs' properties have been contaminated Plaintiffs have suffered the injuries more fully described above.

117.    By allowing, permitting, and failing to stop the migration of contaminated groundwater from the Halliburton facility to the properties described above, Halliburton is strictly liable for the injuries and damages Plaintiffs sustained as a result of this contamination.

118.    Halliburton knew or should have known that by allowing contaminated groundwater to migrate from its facility onto the properties described above, such contamination would cause, and has caused, the injuries to health and property alleged in this Complaint.

119.    Halliburton's reckless disregard for the rights of others, as evident in its actions exposing Plaintiffs to high risks of harm from its abnormally dangerous activities and in acts described more fully above entitles Plaintiffs to an award for punitive or exemplary

damages and exempts Plaintiffs from any statutory cap on damages arising from bodily injury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request this court:

a.  Award compensatory damages for all Plaintiffs for the mental anguish and suffering caused by learning of their past unknowing exposure to contaminated water;

b.  Award compensatory damages for PI Plaintiffs for the personal injuries they allege above, including compensation for:

    i.  medical costs incurred by each PI Plaintiff,

    ii.  compensation for pain and suffering resulting from PI Plaintiffs' injuries, and

    iii.  compensation for emotional distress suffered by PI Plaintiffs;

c.  Establish a medical monitoring fund for those PI Plaintiffs who suffer personal injuries, and for any other Plaintiffs to the extent recognized under Oklahoma law;

d.  Award punitive damages against Halliburton;

e.  Award costs of this action including attorneys' fees to the Plaintiffs; and

f.  Award such other and further relief as this court may deem appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable herein.

Respectfully submitted,

Dated: June 22, 2012

/s/ Joe S. Carson_____
Joe S. Carson, OBA No. 19429
Homsey, Cooper, Hill, & Carson
4816 Classen Boulevard
Oklahoma City, OK 73118
Phone: 405-843-9923
Fax: 405-848-4223
jsc@homseylawcenter.com

and

Todd D. Ommen
Ashley J. Hintz
Weitz & Luxenberg, P.C.
700 Broadway, 5th Floor
New York, NY 10003
Phone: 212-558-5592

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2012, I caused the foregoing document to be electronically filed using the electronic case filing system of the Court.  The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.  All other counsel of record will be served by mail.


/s/ Joe S. Carson